J-A02024-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: S.E.-R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: B.V., MOTHER | No. 2413 EDA 2014 |

Appeal from the Order Entered July 17, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at Nos.: CP-51-AP-0000287-2013
CP-51-DP-0123503-2009
FID: 51-FN-471006-2009

BEFORE: PANELLA, J., LAZARUS, J., and WECHT, J.

MEMORANDUM BY WECHT, J.: **FILED JANUARY 30, 2015**

B.V. ("Mother") appeals the July 17, 2014 order that involuntarily terminated her parental rights to her daughter, S.E.-R. ("Child"), born in June 2008. After review, we affirm.

The trial court, *per* the Honorable Allan L. Tereshko, J., summarized the procedural history of this case and made the following findings of fact:

> On August 25, 2009, [Child] was admitted to St. Christopher's Hospital for Children due to feeding aversion, gastroenteritis, and failure to thrive. [Child] was discharged from the hospital on September 17, 2009.
>
> On December 1, 2009, the Department of Human Services ("DHS") received a General Protective Services ("GPS") Report stating that [Child] had a significant history of failure to thrive and had been hospitalized at least 12 times. [Child's] medical team was unable to determine the cause of her failure to thrive. The report further stated that on December 1, 2009, Mother was contacted regarding [Child's] tolerance for food and her speech was slurred. Mother at the time was manic, quoting Bible verses, and read letters from previous doctors. According to the

report, there were concerns regarding Mother's mental stability and her ability to properly care for [Child]. It was determined that [Child's] condition worsened due to Mother's lack of care.

On December 7, 2009, DHS met with Mother at her home, where she informed DHS that her speech was slurred and she was manic because a family member died. Mother has a history of using drugs and alcohol.

On December 14, 2009, [Child] was admitted to St. Christopher's Hospital for Children. [Child] began to gain weight while hospitalized and was discharged to Mother's care. Mother failed to keep follow[-]up medical appointments.

On December 22, 2009, DHS obtained an Order of Protective Custody ("OPC") for [Child.] DHS placed [Child] in a medical foster home. Mother was referred to the Clinical Evaluation Unit ("CEU") for a dual diagnosis assessment and screen.

At the shelter care hearing on December 24, 2009, the OPC was lifted and the temporary commitment to DHS was ordered to stand.

At the adjudicatory hearing on December 29, 2009, held before the Honorable Flora Barth Wolf, the temporary commitment to DHS was ordered to stand. The court deferred adjudication with DHS supervision. The court referred Mother to CEU for a dual diagnosis assessment and a forthwith drug and alcohol screen. The [court] further ordered weekly two[-]hour supervised visits at the agency, which could be modified by agreement of the parties.

The initial Family Service Plan ("FSP") Meeting was held on January 4, 2010, at which time the goal for [Child] was reunification. The FSP objectives for Mother were stated as: 1) to participate in a dual diagnosis assessment and comply with all treatment recommendations; 2) to participate in drug and alcohol screening; 3) attend parenting classes; 4) keep all visits and maintain regular contact with [Child]; 5) participate in [Child's] medical appointments; and 6) to avoid interfering with the provision of medical supplies to [Child's] foster parents. Mother participated in the meeting.

On June 8, 2010, DHS held an FSP meeting, and the goal for [Child] remained reunification. The FSP objectives remained the same. Mother participated in the FSP meeting.

At the adjudicatory hearing on June 29, 2010, held before the Honorable Flora Barth Wolf, the temporary commitment to DHS was discharged, and [Child] was adjudicated dependent and committed to DHS.

At the permanency review hearing on October 21, 2010 held before the Honorable Flora Barth Wolf, the court ordered Mother be referred to CEU for a dual diagnosis assessment and urine drug screens. The court also ordered Mother to submit to three drug screens prior to the next court hearing and to comply with recommended drug and alcohol and mental health services.

In February 2011, [Child] was reunified with Mother and court supervision was terminated.

On May 12, 2011, Mother received a comprehensive biopsychosocial evaluation though Intercommunity Action, Inc. Mother was diagnosed with cocaine dependence, mood disorder NOS, post[-]traumatic stress disorder, panic disorder, and generalized anxiety disorder. Mother admitted to using alcohol and cocaine and reported that she was receiving inpatient substance abuse treatment at least three times in the past five years.

On June 4, 2011, [Child] was admitted to Children's Hospital of Philadelphia ("CHOP") for feeding intolerance and constipation. [Child] gained weight and thrived while hospitalized.

On June 13, 2011, DHS received a Child Protective Services report providing that Mother stated that [Child] had been vomiting for the past one to two weeks and refusing to be fed by mouth. The report further stated that [Child] did not vomit while in the presence of staff at CHOP, and that there was no medical reason for [Child's] vomiting. In addition, it was reported that Mother failed to attend an intensive feeding program offered by CHOP and that she missed nine appointments for [Child] to be seen at the CHOP Care network.

DHS obtained an OPC on June 15, 2011 for [Child.]

On June 28, 2011, DHS held an FSP meeting, and the goal for [Child] was reunification. The FSP objectives for Mother were stated as: 1) to attend a psychiatric evaluation and comply with recommendations; 2) to complete a parenting capacity evaluation; 3) to meet with a therapist on a regular basis; 4) to

comply with previously developed FSP objectives; and 5) to meet regularly with [Child's] agency social worker.

At the adjudicatory hearing on August 29, 2011, held before the Honorable Donna M. Woelpper, the court ordered Mother to have supervised visitation, and to have a forthwith drug screen, drug and alcohol assessment and monitoring by CEU.

At the adjudicatory hearing on September 16, 2011, held before the Honorable Donna [M.] Woelpper, the temporary commitment to DHS was discharged, and [Child] was adjudicated dependent and reunified with Mother. In-home protective services were implemented in Mother's home to monitor [Child's] safety. The court further ordered Mother to continue with the mental health treatment plan, comply with feeding programs at CHOP, comply with all evaluations and appointments, and complete all FSP objectives.

At the permanency review hearing on November 1, 2011, held before the Honorable Donna M. Woelpper, the court referred Mother to BHS for psychiatric evaluation and any other necessary psychological evaluations.

On November 21, 2011, DHS held a FSP meeting, and the goal for [Child] remained reunification. The FSP objectives for Mother [were] stated as: 1) to attend a mental health evaluation and comply with recommendations; 2) to meet with a therapist on a regular basis; 3) to provide [Child] with nutritious meals; and 4) to comply with previously developed FSP objectives. Mother participated in the meeting.

On December 21, 2011, the case aide responsible for transporting [Child] to medical day care at Lauren's House reported that Mother had a bleeding cut on her face that she wiped off while talking to her.

On January 5, 2012, the case aide reported that Mother appeared to be under the influence, slurred her words, and kept repeating herself.

On January 11, 2012, pursuant to DHS's emergency relist request, the case was held before the Honorable Donna M. Woelpper. The court ordered Mother to produce a urine drug screen. The court further ordered that DHS place [Child] if Mother did not ensure she attended medical day care daily at Lauren's House, or if her urine screen was positive. The court

also ordered Mother to have three random drug screens prior to the next court hearing, and to comply with [Child's] feeding clinic.

At the permanency review hearing on March 26, 2012 held before the Honorable Edward C. Wright, the court removed [Child] from Mother's care. In addition, the CHOP feeding program reported Mother missed 23 of 48 mandatory meals with [Child].

On May 17, 2012, DHS requested Mother submit a urine drug screen within one day. Mother submitted a urine screen on May 25, 2012.

On May 24, 2012, Mother was referred to the Achieving Reunification Center.

On June 4, 2012, Mother tested positive for cocaine.

On June 22, 2012, Mother was discharged unsuccessfully from her drug treatment program at Interac.

On October 2, 2012, Mother appeared under the influence of drugs at DHS.

On November 9, 2012, Mother tested positive for drugs.

At the permanency review hearing on December 20, 2012, held before the Honorable James Murray Lynn, the court referred Mother to CEU for monitoring and 12 random screens prior to the next court hearing. The court ordered Mother to have supervised visits at the agency for one hour, and that if she misse[d] one visit, visits [would] be decreased to bi-weekly for one hour, and to be suspended if she misse[d] two visits.

Mother reported to CEU in March 2013 to produce a screen on a date of her own choosing. She did not submit to three random screens.

Trial Court Opinion ("T.C.O."), 9/15/2014, at 2-11 (citations to record omitted; modifications to capitalization).

On May 9, 2013, DHS filed a petition to terminate Mother's parental rights.[1] The trial court (*per* Judge Tereshko) held hearings on the petition on November 21, 2013 and February 19, 2014. On July 17, 2014, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Also on July 17, 2014, the trial court changed Child's goal from reunification with Mother to adoption.

On August 15, 2014, Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On September 15, 2014, the trial court filed its Pa.R.A.P. 1925(a) opinion.

Mother raises four issues for our review:

1. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating [Mother's] parental rights under 23 Pa.C.S.A. § 2511(a), where the evidence showed that [Mother] substantially complied with the Family Service Plan goals established by the Department of Human Services of the City of Philadelphia (DHS), and further that DHS failed to provide adequate services to assist [Mother] in remedying the conditions that brought [Child] into care?

2. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating [Mother's] parental rights under 23 Pa.C.S.A. § 2511(a) and (b), where [DHS] failed to prove by clear and convincing evidence that involuntar[ily] terminating [Mother's] parental rights would best serve the emotional needs and welfare of [Child]?

_____

[1] DHS also petitioned to terminate the parental rights of the unknown father. The trial court's July 17, 2014 order terminated the unknown father's parental rights.

3. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating Mother's parental rights without fully considering the impact of termination of the emotional needs and welfare of [Child]?

4. Did the trial court commit an error of law and abuse of discretion by changing the permanency goal of [Child] from reunification to adoption where [DHS] failed to provide sufficient evidence that such a goal change would be best suited for [Child's] needs and welfare?

Mother's Brief as 2-3 (citations modified).

In her first three issues, Mother challenges the termination of her parental rights. We address those issues together. Our scope and standard of review for the termination of parental rights are as follows:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve

- 7 -

errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

***In re M.G.***, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

Mother's rights were terminated pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). In pertinent part, these statutory provisions provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
> >
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
> >
> > * * *
> >
> > (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
> >
> > * * *
> >
> > (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with

an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

In order to affirm the termination of parental rights, this Court need only agree that grounds to do so have been established pursuant to any one subsection of section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Therefore, although the trial court found grounds to terminate pursuant to multiple subsections, we will only address section (a)(8). In doing so, we must consider that:

In a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by "clear and convincing" evidence the existence of grounds for doing so. The standard of "clear and convincing" evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

- 9 -

*In re Adoption of Dale A., II*, 683 A.2d 297, 299 (Pa. Super. 1996)

(citations omitted).

> To terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the [child's] removal by the court. Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of [the child welfare agency] supplied over a realistic time period. Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of [the child welfare agency's] services.

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (some citations omitted).

Mother argues that she has stopped her drug use, offering evidence in the form of clean drug screens. Mother contends that the evidence did not support the trial court's conclusion that she did not comply with the drug screening requirements. Mother also argues that she was compliant with her mental health goals and that she, in fact, attended outpatient therapy. Mother asserts that she "substantially complied with her visitation plan" and attended fifty-five out of seventy-four visits between March 2012 and November 2013. Further, Mother argues that Child does not suffer from the same medical issues that led to the dependency and, therefore, there is no

evidence that Mother could not care for Child. Finally, Mother argues that the record did not support the conclusion that Mother and Child do not share a strong bond. Rather, Mother asserts that the evidence demonstrated that Mother and Child share a bond and a loving relationship. Mother's Brief at 11-19, 21-26.

There is no question that Child had been out of Mother's care for more than twelve months prior to the hearing. Further, in assessing Mother's conduct, the trial court could not consider any post-petition conduct. 23 Pa.C.S.A. § 2511(b). Therefore, like the trial court, we may not consider Mother's conduct after May 9, 2013.[2] The trial court found that Mother had failed to comply with her drug and alcohol treatment, had failed to comply with random drug screens, had failed to attend Child's medical appointments, and had failed to comply with her mental health treatment. T.C.O. at 13. Therefore, the trial court concluded that the conditions that led to Child's placement had not been remedied. *Id.* at 14. Our review of the record finds that there is sufficient evidence to support those findings and conclusions.

_____

[2] Most of the progress that Mother relied upon in her brief occurred after the petition was filed. *See* Notes of Testimony ("N.T."), 11/21/2013, at 63-64 (citing November 21, 2013 report that Mother was complying with mental health treatment and had a clean urine screen); N.T., 2/19/2014, at 14 (discussing negative drug screens).

Cathy Rosber, the current DHS social worker, testified that, when she was assigned the case in November 2011, Child was living with Mother. Notes of Testimony ("N.T."), 11/21/2013, at 6. A safety plan was in place that required Child to attend a medical day care and a feeding program without any absences. *Id.* at 7. However, Child had absences from both programs. The bus drivers reported that, on various occasions, Mother was erratic, had slurred speech, and cursed at the bus drivers. *Id.* at 8-9. Although Mother sometimes took Child to the CHOP feeding clinic, Mother and Child missed half of the appointments and Mother missed the parenting training provided. *Id.* at 56. Mother had been discharged from her drug and alcohol treatment due to non-compliance with the program. *Id.* at 16. Ms. Rosber testified that Mother never completed her FSP goals and objectives. *Id.* at 18. Mother did not participate in all of the random screens ordered by the court. Often she was difficult to reach for screens because her phone number kept changing or messages could not be left on her phone. *Id.* at 34-37. Ms. Rosber opined that there was no reasonable prospect that Child would be reunited with Mother at that point due to Mother's "non-compliance with the [drug and alcohol] program or inability to remain in contact with DHS and comply with the order for the random screens." *Id.* at 39. Ms. Rosber admitted that Mother had attended some visits with Child. *Id.* at 38. Between March 2012 and December 2012, Mother attended twenty-four of thirty-seven visits, and December 2012 through May 2013, Mother attended nine of twelve visits. *Id.* at 86-87.

Karen Wells, Mother's therapist, testified that Mother's attendance at therapy was inconsistent. N.T., 2/19/2014, at 47. Although Mother's drug and alcohol treatment groups were scheduled every weekday, Mother only attended one or two per week. *Id.* at 47-78. Mother was discharged in May 2013 without completing the drug and alcohol component of treatment. *Id.* at 50. Mother was referred to a mental health treatment program that met less often. *Id.* at 52. Thus, based upon this record, the trial court had sufficient support for its conclusions that Mother had not met her FSP goals, and that the conditions that led to placement continued to exist.

Next, we must review the trial court's conclusion that termination is in Child's best interest. Both subsections (a)(8) and (b) require an analysis of Child's needs and best interest. However, the trial court must be satisfied that termination serves a child's needs pursuant to (a)(8) before engaging in a best interest analysis pursuant to subsection (b). *In re C.L.G.*, 956 A.2d 999, 1008-09 (Pa. Super. 2008). The trial court concluded that termination was in Child's best interest. T.C.O. at 17. From the record developed, and as we have discussed above, we find no abuse of discretion.

Pursuant to subsection (b), the trial court must also consider whether termination would best serve "the developmental, physical and emotional needs and welfare of" Child. "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). The trial court also must consider the nature and status of the

parent-child bond, particularly the effect upon the child of permanently severing that bond. *Id.*

The court may prioritize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008) (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (citations omitted).

In making its decision, the trial court considered the following. Ms. Rosber testified that Child is bonded with her foster family and foster siblings. N.T., 11/21/2013, at 41. Anne Schloneker, the foster care agency social worker, testified to the same effect. *Id.* at 80-81, 85. Child calls her foster parents "Mom" and "Dad." *Id.* at 41, 80-81. However, she also calls Mother "Mommy." N.T., 2/19/2014, at 108. At the time of the November 2013 hearing, Child had been in her foster placement for nineteen months. N.T., 11/21/2013, at 41. Ms. Schloneker testified that the foster family meets all of Child's needs and that Child is healthy. *Id.* at 81-82. Child was enrolled in kindergarten and was involved in extracurricular activities in the foster family's community. *Id.* at 42. Ms. Rosber opined that, because Child considers herself part of the family, she would be harmed if removed

- 14 -

from her foster family. *Id.* at 44. Ms. Schloneker concurred with Ms. Rosber's opinion. *Id.* at 82-83. Leslie Archer, a Child Advocate social worker, also testified that she believed that Child would be harmed if she were removed from the foster family because she had bonded with her foster parents and the foster siblings in the home. *Id.* at 100-01.

Ms. Schloneker testified that, although Child's visits with Mother go well, Child usually has no trouble separating from Mother or going back to her foster family. *Id.* at 84. Child is excited to return to her foster family after visits with Mother. *Id.* at 85. Ms. Archer testified that Child is hesitant with Mother during visits and is less comfortable with Mother than with her foster family. *Id.* at 101-02.

Stephen Miksic, Ph.D., performed a parenting capacity and bonding evaluation. N.T., 2/19/2014, at 58. Dr. Miskic opined that there was a positive, but insecure, bond between Mother and Child. *Id.* at 64-65. Dr. Miskic believed that Child had a strong bond with her foster family. *Id.* at 65-66. Dr. Miskic opined that Child would not suffer irreparable harm if Mother's rights were terminated. *Id.* at 69-70.

While there was evidence that Mother and Child had a bond, and that Child would miss Mother should the visits end, the trial court is free to believe all, some, or none of that evidence and to give that evidence the weight that the trial court believes that it deserves. *See In re M.G.*, *supra*. Based upon the record, there was sufficient evidence to support the trial court's conclusions that termination was in Child's best interest.

Finally, Mother argues that the trial court erred in changing Child's goal from reunification to adoption. Mother contends that the goal must be in Child's best interest and argues that adoption is not in Child's best interest, because Child will be adversely affected by the termination of a beneficial relationship between Mother and Child. Mother's Brief at 26-27.

At each permanency hearing, the trial court must consider, among other things, whether the current placement goal for the child is still appropriate. 42 Pa.C.S.A. § 6351(f). In making that determination, the trial court must consider the following:

> In a change of goal proceeding, the best interests of the child, and not the interests of the parent, must guide the trial court, and the parent's rights are secondary. The burden is on [DHS] to prove the change in goal would be in the child's best interests.

*In re M.T.*, 101 A.3d 1163, 1173 (Pa. Super. 2014) (citations omitted).

> [T]he focus of all dependency proceedings, including change of goal proceedings, must be on the safety, permanency, and well-being of the child. The best interests of the child take precedence over all other considerations, including the conduct and the rights of the parent. . . . [W]hile parental progress toward completion of a permanency plan is an important factor, it is not to be elevated to determinative status, to the exclusion of all other factors.

*In re M.T.*, 101 A.3d at 1175 (citation omitted; modifications in original).

Here, as discussed above, although there was evidence of a bond between Mother and Child, the evidence also indicated that Child's primary bond was with her foster family. Thus, there was ample evidence from

- 16 -

which the trial court could conclude that adoption was in Child's best interest. We find no abuse of discretion in the goal change.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/30/2015